HawkiNS, J.,
delivered the opinion of the Court.
The plaintiffs in error were indicted, in the Cuit Court of Smith County, for stealing one mare and one bay horse, the property of one liam Young. A trial was had, which resulted verdict of guilty. A new trial was refused, roan Wil-in a and *364 judgment pronounced upon the verdict; to reverse which an appeal is prosecuted to this Court.
The proof, as set out in the bill of exceptions, shows, that, late in the evening óf the 10th of March 1866, the plaintiffs in error were seen together, passing on foot along the road, near to, and in the direction of, the residence of Young; and again, after having passed Young’s residence a short distance, at a spring. At the time they passed Young’s residence, a roan mare and bay gelding, belonging to Young, were in the lot, and were afterwards put in the stable and fed. Some time during the night following, they were stolen, together with a boy’s saddle, and two bridles. During the same night Mr. Young’s smoke-house, with its contents, consisting of bacon, lard, meat, etc., was burned, either by accident or design. On the 13th of March following, the plaintiffs in error passed through McMinnville, going in the direction of Jasper. One was riding on a boy’s saddle, the other was riding bare-back. They were badly dressed, and riding fine horses. These facts, created a suspicion, in the minds of the citizens of the' town, that something was wrong; and persons were induced to pursue and arrest the men. At the time tmy were arrested they were in possession of the toan mare and bay gelding, and the saddle and bridle, which had been stolen from the stable of oung, on the night of the 10th of March. After their arrest, they were separated and interrogated as to the ownership of the horses — where and how they got them— where they were from, and where they were going. *365 One said bis name was Gfillentrise; tbe other that-his name was Wilson. They afterwards gave other' names. One said he bought his horse at a government sale in Nashville, but did not know how the other got his, whether he had stolen him or not. They said they were going to Jasper, near which place their fathers lived. They also' stated they had rode the horses from home to Nashville to get into work. These statements were made to the party making the arrest.
The prisoners were then lodged in jail at McMinn-ville, where they remained a few days, when they were applied for and taken out of jail by the Sheriff of Smith County, who stated to them, at the time, he was a friend, and had come to take them out of jail; after which they told him, and one Allen, who acted in the capacity of a guard, in assisting the Sheriff to remove the prisoners from McMinnville to Carthage, that they had bought the horses at Mur-freesboro’; that they had never been in Smith County. They assumed several different names, one of which was Allen; but when they got near Carthage they stated that what they had said about never having been in Smith County, was untrue, and then gave their names as Wiley and Massey.
Allen proved, that, while they were on their way from McMinnville to Carthage, with the prisoners in custody, he thinks he told them they ought to tell all the truth about the taking of the horses — that it would be better for them to do so. It also appears, that the statements, made by the plaintiffs in error, to the parties *366 who arrested them, and before they were placed in jail at McMinnville, were made while they were in custody, and in answer to interrogatories propounded to him by those who had them in custody. After they had been taken out of the jail at McMinnville, and while in the custody of the guards, Wiley, one of the prisoners, asked for a private conversation with Young, the prosecutor, which being granted, Wiley said to Young he wanted a separate trial; that he could prove, by two as respectable men as there were in Smith County, that he bought the horse he had from a man at the creek near the residence of Young. Young asked who? Wiley replied it would be time enough to tell when the trial came on. He also stated that he had passed the house of Young at the time stated, but did not take his horses; that on the next morning after passing his house, they passed through Gallatin, and from thence they passed to Sandersville, Nashville, Murfreesboro’, Woodbury, and McMinnville. It appears that the distance of the residence of Young from Gallatin, is thirty-eight miles; thence to Nashville, is about twenty-nine miles; thence to Murfreesboro’ is about thirty miles; and from thence to McMinnville, .is about fifty-seven miles.
The counsel for the prisoners asked the Court to withdraw from the jury, all the statements made by the prisoners to the witness, after their arrest, and before they were put in jail at McMinnville; also, the statements made by them to the Sheriff, Smith, and Allen, the guard,' as to how they got the horses — their names, and where they lived — which the Court refused *367 to do. And it is now insisted these statements were inadmissible, and, the refusal of the Court to withdraw them from the jury, was error. We do not think so. It is not insisted that the statements made by the plaintiffs in error, before they were committed to jail at McMinnville, were not free and voluntary, or that they were the result of hope or fear, induced by those having power over them; but it is insisted, they were inadmissible, simply because the plaintiffs in error were in custody at the time the statements were made; and they were made in answer to interrogatories propounded to the prisoners by persons who had them in custody. We are not aware of any rule of evidence, by which statements under such circumstances, are inadmissible, and we certainly can perceive no reason for any such rule. The rule is, if a person, overawed and subdued by a criminal charge, under the influence of hope or fear, induced or excited by those having power over him, by means of threats, promises, or otherwise, make a confession or statement, which is the result of such hope or fear, and which, if taken as true, tends to establish his guilt, such statement or confession is inadmissible as evidence against the person making it; for under such influence, a person may confess himself guilty of the crime laid to his charge, when, in fact, he is innocent. Therefore, his statements or confessions, of the character stated, made under such circumstances, can have no tendency whatever to prove that he is guilty of the crime. But, to exclude the statements or confessions of the prisoner, it must appear they were the result of hope or *368 fear thus excited, and not freely and voluntarily made. The presumption is, that a person who is innocent of crime, will not, in the absence of influence, confess himself guilty. Therefore, a confession freely and voluntarily made, is entitled to great weight. Even if the statements made by the prisoners to the Sheriff, Smith, and the witness, Allen, on the way from Mc-Minnville to Carthage, were such as, if taken as true, would tend to establish the guilt of the prisoners, we are at a loss to see how they could have been the result of hope or fear, excited by any means employed by them or any one else. Certainly the statement of the Sheriff to the prisoner at the jail, that he was a friend, and had come to take them out of jail, could have had no such influence. The statement, however, of Allen to the prisoners, that they ought to come out and tell all about how they got the horses — that it would be better for them to do so — is of a very different character, and was well calculated to arouse the fears and excite the hopes of the prisoners, and influence them to make statements, confessing their guilt, or tending to establish their guilt, if taken as true. And if the prisoners were thereby induced to make any such statements, they would have been clearly inadmissible as evidence against them. But it does not appear that the statements made by the prisoners, as detailed by Allen or Smith, were induced by this statement of Allen, inasmuch as the record does not show at what point of time the statement of Allen was made to the prisoners — whether before or after the contradictory and conflicting statements of the. prison *369 ers, as detailed by the witnesses, were made. The statements, as detailed in evidence, do not amount to a confession of guilt; neither do they tend, if taken as true, to establish the guilt of the prisoners, of the crime with- which they are charged.. We are, therefore, of the opinion, the refusal of the Court to withdraw the testimony from the jury, was not error.
The counsel for the prisoners objected' to the admission of the testimony concerning the fact of the burning of Young’s smoke-house, on the night the horses were stolen; but the objections were overruled, and the evidence permitted to go to the jury, alone upon the ground, as the bill of exceptions states, set forth in the charge. This, it is insisted, was error.
Upon this subject, the Circuit Judge charged the jury as follows: “The charge upon which the defendants are now upon trial, you are to distinctly bear ‘in mind, is not a charge of house-burning, but a charge of horse-stealing. The offense of burning the house referred to, is one for which the defendants are liable to be tried upon another indictment. You are, therefore, to bear in mind, that in the event you find the defendants guilty of the offense laid to their charge in the present indictment, you are not, in- fixing the punishment, to allow the circumstance of the house-burning to have any influence upon, your minds, in making up your verdict. It is with no such understanding, that the State has been permitted to introduce this circumstance; neither has the State been permitted to introduce it, for the purpose of inference from this, that the defendants would ‘ be capable of *370 committing the offense with which they stand charged. The guilt of the defendant, on trial for one felony, cannot he inferred by showing that he has committed other felonies, at other times. All such testimony is wholly inadmissible; neither would it he competent to prove, that the defendants set fire to the prosecutor’s smoke-house, on the same night the horses are alleged to have been stolen from the same premises, merely for the purpose of creating an inference, that in being guilty of this offense, they would be capable of committing the offense with which they stand charged. It is not from any such considerations as this, that this circumstance has been admitted as proof before you. But while all this is so, it is a principle of law, equally well-settled, that the State is allowed to prove the manner in which the offense under consideration may have been committed; and if, in a case of alleged larceny, the State can show that the larceny was perpetrated by means of stratagem, or artifice, this may be shown by way of showing the felonious intent in taking the property. It is upon this principle that the house-burning has been admitted in proof before you. It is insisted, on the part of the State, that the defendant set fire to the prosecutor’s smoke-house, for the purpose of creating a diversion, so as more effectually to make their escape with the horses. In this point of view, the Court has considered the evidence competent; but as to the weight or importance to be attached to it, as tending to establish this fact, it is for you to determine, if you should think the smoke-house took fire by accident, *371 of course the proof in reference to the burning, amounts to nothing. And even if you should think that the defendants actually set it on fire, this will not he a circumstance to be considered of by you, for any purpose, unless you should find they did so for some purpose connected with the stealing of the horses; and any conclusions in reference to this, adverse to defendants, must be drawn from the evidence.”
There is no proof, whatever, in this record, connecting the plaintiff in error with the burning of the houses; but, on the other hand, from all we can see, it seems to have been the result of accident; and it is, indeed, 'difficult to discover the object of the introduction of the proof. Eor what purpose it was used upon the trial, or what effect it may have had upon the jury trying the cause, we have no means of ascertaining. His Honor, the Circuit Judge, in his instructions to the jury, says:
“Much has been said in argument, upon both sides, in reference to the fact of a house having been burned, on the premises on which the alleged larceny is said to have been committed, on the same night it is al--leged to have taken place.” It is from this, very apparent, that the counsel for the prosecution, insisted that the circumstances warranted the jury in coming to the conclusion that the plaintiffs in error fired the smoke-house, and did so for the purpose of creating a diversion, by which they would be enabled to accomplish the felonious intention of stealing the horses without detection; but the question for our consideration, is this: Is the evidence admissible, under the *372 rules, for any purpose? The solution of which has given us much trouble.
The general rule is, that nothing shall be given in evidence, which does not directly tend to the proof or disproof of the matter in issue; and evidence of a distinct substantive . offense, cannot be admitted in support of another offense; but, in many cases, it becomes important to ascertain, whether a thing was done accidentally or wilfully, and, in such case, proof of a distinct substantive offense, may be admissible; as, e„ g., if a person be charged with having wilfully poisoned another, by administering a certain powder; and it becomes a question, whether he knew the powder to be poison, evidence would be admissible to show that he had administered it to another person who had died- And when the scienter or quo animo is a requisite to, and constitutes a necessary and essential part of, the crime with which the person is charged, and proof of such guilty knowledge or malicious intention, is indispensable to establish his guilt in regard to the transaction in question, testimony of such acts, conduct, or declarations of the accused, as tend to establish such knowledge or intent, is competent, notwithstanding they may constitute, in law, a distinot crime; and evidence tending to prove a distinct felony, committed by the prisoner, is admissible, when the acts are connected as parts of one entire transaction. When it becomes necessary to prove a guilty knowledge upon the part of the prisoner, evidence of other offenses committed by him, though not charged in the indictment, is admissible for that purpose; and *373 if it be material to show the intent with which the act charged, was done, evidence may be given of a distinct offense; thus, upon an indictment for maliciously shooting, if it be questionable whether the shooting was by 'accident or design, proof may be given, that the prisoner, at another time, intentionally shot at another person. But, on a trial for one offense, evidence of another wholly distinct and unconnected, is not admissible for any purpose. On a trial for homicide, the Attorney General offered proof, going to establish the fact, that the defendant had, some short time before the murder, set fire to the house of the deceased in the night, it was held the .proof was inadmissible: Whart. Am. Cr. Law, 238, 239; 4 Hum., 27; 5 Hum., 9.
Tested by these rules, was the evidence competent for any purpose? We think it. was not; and can easily see how it may have had an influence upon the minds of the jury, prejudicial to the plaintiffs in error.
As appears from this record, the burning of the smoke-house of the prosecutor, is wholly unconnected with the stealing of his horses, although it may have happened on the same night.
It is certainly true, as stated by His Honor, the Circuit Judge, that the State is allowed to prove the manner in which the offense under consideration, may have been committed. Such proof tends, with great force, to the elucidation of the questions involved in the issue; and in this case, if the proof showed that the plaintiffs in error, fired the smoke-house for the *374 purpose of creating a diversion, to enable them to commit the larceny, or to escape after the commission of the larceny, then the arson and the larceny would form parts of the same transaction; and proof of the arson, although it would constitute a distinct substantive offense, would be admissible, but not otherwise.
The prisoner’s counsel, also, objected to the proof, tending to show the plaintiff in error had committed a larceny, in taking the saddle and bridle; birt the objection was overruled, as we think correctly. . The taking of the horses, and the saddles and bridles, appear to have been parts of the same transaction, and, therefore, the proof as to the saddles and. bridles was admissible as evidence, to establish the guilt of the parties, of the offenses with which they are charged.
It is also insisted there is a variance between the indictment and the proof, in this, that the indictment describes the property stolen, as “one roan mare and one bay horse,” while the proof shows it to have been “one roan mare and one bay gelding.” And it is further insisted, that the plaintiffs in error cannot be convicted of stealing a “bay gelding,” upon an indictment charging them of stealing a “bay horse;” and that, under the Act of May 17, 186*5, they cannot be convicted of stealing a mare; and that the charge of the Circuit Judge to the jury, that the word “horse,” as used in the Act, includes animals of both sexes, is erroneous; but we do not think either of these propositions can be maintained.
Section 50 of the Code, provides, that “words used *375 in the Code, importing tlie masculine gender, include the feminine and neuter;” and by section 4686, it is declared that, “whoever shall feloniously take or steal any horse, mule, or ass, shall be imprisoned,” etc.; and by sec. 4687, it is declared, “the words horse, mule, ass, in the preceding section, include animals of both sexes and all ages, embraced under these generic terms, respectively.” •
These provisions were not intended to define the words, “horse, mule, ass,” and limit the definitions thus given to the words as used by the Code; but they were intended to affix a legal definition to the words* whenever used; and sec. 1 of the Act of May 17, 1865, declares that, “whoever shall feloniously take or steal any horse, mule, or ass, shall, on conviction,” etc.'
But, because of the admission of incompetent testimony as to the burning of the smoke-house of the prosecutor, the judgment of the Circuit Court must be reversed; and the cause remanded.